## FORD MOTOR CO. v. MADDOX MOTOR CO.
### (No. 3474.)

Court of Civil Appeals of Texas. Texarkana.
Feb. 20, 1928.

Rehearing Denied March 15, 1928.

1. Contracts ☞238(2)—Written contract, determinable at option of either party, may be modified by subsequent parol agreement.

A written contract which is determinable at option of either party, and thus not required to be in writing, may be modified or amended by a subsequent parol agreement.

2. Frauds, statute of ☞50(1)—Contract contemplating performance running more than year, but performable within year on happening of contingency, is not obnoxious to statute.

Contract expressly providing for obligations to be performed during period of more than a year, but which may, on happening of contingency, be fully performed within less than a year, is not obnoxious to the statute of frauds.

3. Frauds, statute of ☞50(2)—Personal contract, ending with death of party, is performable within year.

If an oral contract evidences a personal undertaking which ends with death of one or more

of parties, it comes within that class of contracts which may be performed within less that one year, regardless of the contractual period named.

**4. Frauds, statute of ☞50(2)—Contract creating automobile sales agency held one for personal undertaking, "performable within one year" within statute of frauds.**

Contract between manufacturer and dealers making latter manufacturer's sales agents, and prohibiting its assignment without consent of manufacturer, personal fitness of dealers being important consideration, *held* to be a contract evidencing a personal undertaking, which would terminate on death of dealers, and is one performable within one year, and not required to be in writing under statute of frauds.

**5. Principal and agent ☞123(1)—Evidence held not to show actual authority in chief roadman of automobile manufacturer to modify written automobile sales agency contract by oral agreement.**

Automobile dealers, suing for breach of automobile sales agency contract, relying on parol modification of written contract by chief roadman of automobile manufacturer, *held* not to have shown actual authority of such roadman to make or modify written contract.

**6. Corporations ☞429—One dealing with agent of corporation must exercise proper diligence to ascertain agent's authority to bind principal.**

One who deals with an agent of corporation must exercise proper diligence to ascertain the agent's authority to bind his principal.

**7. Principal and agent ☞122(1)—Whether agent is acting within apparent scope of his authority must be determined by principal's conduct, not by agent's acts and declarations.**

Whether or not agent is acting within apparent scope of his authority must be determined by what the principal has done, not by unratified acts and declarations of the agent.

**8. Principal and agent ☞123(1)—Evidence held not to show that agent of automobile manufacturer acted within apparent scope of his authority in parol modification of automobile sales agency contract.**

Evidence *held* not to show that chief roadman of automobile manufacturer was acting within apparent scope of his authority in modifying written automobile agency sales contract with dealers, terminable at option of either party, by parol agreement that dealers would have privilege of conducting agency for six years.

**9. Principal and agent ☞137(1)—Liability for unauthorized acts of agent within apparent scope of his authority rests on principle of estoppel.**

Liability for unauthorized acts of agent, done within apparent scope of his authority, rests on principle of estoppel, and, unless party dealing with such agent has been misled by agent's conduct to alter his position or perform some agreement resulting in injustice, if principal were permitted to deny agent's authority, doctrine of apparent authority has no application.

On Motion for Rehearing.

**10. Evidence ☞441(1)—Evidence of parol agreement, conflicting with subsequent written contract, held inadmissible.**

Testimony as to parol agreement, in conflict with subsequent written contract, is inadmissible, there being no claim of fraud, accident, or mistake, since acceptance of written contract superseded all previous parol stipulations.

**11. Trial ☞60(2)—Evidence of agent's parol modification of prior written contract is inadmissible, in absence of evidence of agent's authority to bind principal.**

Evidence of parol agreement of agent modifying previous written contract is inadmissible, in absence of evidence showing real or apparent authority in agent to bind his principal by such parol agreement.

**12. Principal and agent ☞161(2)—Principal may repudiate agent's unauthorized acts, except where subsequently ratified, or where innocent third party would be injured thereby.**

Principal has right to repudiate unauthorized contract of his agent, except when contract has subsequently been expressly or impliedly ratified, or where an innocent third party, who has exercised proper diligence to ascertain the authority of the agent, would be injured by permitting principal to repudiate acts of agent.

**13. Estoppel ☞116—One pleading estoppel has burden of proving facts constituting estoppel.**

One who pleads an estoppel has the burden of proving the facts which constitute the estoppel.

Appeal from District Court, Camp County; R. T. Wilkinson, Judge.

Action by F. W. Maddox and another, partners, doing business under the name of the Maddox Motor Company, against the Ford Motor Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded for new trial.

Leon C. Huvelle and Arch Allen, both of Dallas, and Henderson & Bolin, of Daingerfield, for appellant.

C. E. Bryson, of Pittsburg, and Jones, Jones & Buck, of Marshall, for appellee.

HODGES, J. This suit was filed in the court below against the Ford Motor Company by F. W. Maddox and J. H. Mitchell, who were conducting a Ford sales agency in Pittsburg, Tex., under the partnership name of the Maddox Motor Company. The purpose of the suit was to recover damages for the breach of an automobile sales contract made by the parties to the suit in 1922 and renewed in 1924. After a trial before a jury, a judgment was rendered in favor of the plaintiffs against the Ford Motor Company for the sum of $23,500 as damages. This appeal is from that judgment.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The record in the case is large, and numerous errors have been assigned. But, in view of the disposition which we make of the case, only a few of the questions involved need be discussed.

According to evidence which is apparently undisputed, and the testimony offered by the appellees, the following is a fair summary of the material facts: In the early part of 1923 what is called the Ford Sales Agency at Pittsburg, Tex., was owned and conducted by the Nichols Motor Company. The business of that agency was selling the cars, trucks, and products of the Ford Motor Company, a private corporation located at Detroit, Mich. Appellee Maddox was interested in that agency. Because of some dissatisfaction on the part of the Ford Motor Company, the contract with Nichols was canceled about the 1st of February, 1923. Shortly after the cancellation of that contract, the appellees, Maddox and Mitchell, agreed to apply for the agency, and did file an application with the Ford Motor Company's branch office at Dallas, Tex., for a similar contract for the sale of Ford products at Pittsburg. For the purpose of pressing their application, both Maddox and Mitchell went to Dallas, and, while there, had a personal interview with K. W. Brown, the chief roadman in Texas of the Ford Motor Company. Since what was said in the conversation that followed between the appellees and Brown is relied on as constituting the first contract, referred to in the pleadings, the version given by Maddox is here quoted:

"The conversation, as well as I remember, started, the first thing—when K. W. Brown walked up there and shook hands with us, and he said, 'Now, gentlemen, if you have come over to intercede for the old dealer, Mr. Nichols, I am a busy man, and I haven't got time to talk to you.' I said, 'Mr. Brown, I have come over here to make application for the Ford agency myself for Pittsburg.' When I told him that I was over there to negotiate for the agency or contract at Pittsburg, Brown said, 'Mr. Maddox, you understand I have got seven applications on my desk now for the agency at Pittsburg, and some of them are old experienced dealers; but', he said, 'Listen, if you will do what I want you to, I will give you the contract.' And I said, 'Mr. Brown, what do you want me to do?' and he said, 'Go back home and secure a well located lot and build a house, a building that we will accept and approve, not only for the present time, but for the future home of the Ford.' I says, 'Mr. Brown, how long will you give me a contract if I will go home and secure a location that you will approve and build a building that you will accept on it?' He said, 'You understand, Maddox, the written contract that we put out is only for twelve months'; and I said, 'Mr. Brown, I couldn't build a building—buy a lot and build a building like you would want for any Ford contract for a period of twelve months'; and he said, 'Listen, Maddox, you ignore the written contract that will be sent you later; I will give you a contract for a period of six years, if you

3 S.W.(2d)—58

will do what we want you to do, buy a lot and build a building that we will accept and approve, at Pittsburg.' I said, 'I will do that.' He then turned around to Dr. Mitchell and said, 'Dr. Mitchell, will Maddox build a building like we want in Pittsburg? Will you guarantee it, Doctor, that he will build a building like we want?' and Dr. Mitchell said, 'I will guarantee that he will build it as you require'; and he said, 'Then that is enough. I am a busy man. You go back home, and I will ship you some cars,' which he did."

Within a few days after the return to Pittsburg, Maddox received a lengthy written sales contract, which contained, among other things, the following provisions:

"This agreement, made at Highland Park, Michigan, this 2d day of Jan., 1924, by and between the Ford Motor Company, a Delaware corporation, of Highland Park, Michigan, hereinafter known as the company, and Maddox Motor Company, located at Pittsburg, in the state of Texas, hereinafter known as the dealer, Witnesseth:

"(1) That company hereby grants to dealer the privilege of selling Ford automobiles, trucks, chassis, Fordson tractors, Lincoln automobiles, chassis, parts, and accessories for use within the boundaries of the United States of America, upon the terms and conditions herein specifically set forth.

"(2) Company reserves the right to appoint other dealers in any part of the United States of America, and also reserves the right to make direct sales of its products to customers any place in the United States of America without being obligated to pay to any of its dealers a commission upon said direct sales. Company expressly reserves the right to sell its products to the United States government, or to any of the departments thereof, or to the American Red Cross, without the payment of any discount or commission whatever to dealer, and dealer agrees to immediately turn over to the company any inquiries or orders received therefrom without any payment or compensation to him therefor, and to make deliveries of the company's products, as it may direct, without charge for the handling, etc.

"(3) Dealer agrees to maintain a place of business and properly equipped salesroom and service station, prominently located and acceptable to the company, and shall employ competent salesmen and efficient workmen, and company shall not in any wise be responsible for any charges connected with such place of business.
*　　*　　*　　*　　*　　*　　*

"(5) In order that company may determine the prospective requirements of its business, and may base its purchases for materials, etc., thereon, the dealer agrees that he will furnish to company on form provided, prior to December thirty-first of each year, an estimate of the number of Ford automobile trucks, chassis, Fordson tractors, and Lincoln automobiles and chassis, dealer will sell at retail, and to be shipped him in the various months of the following year as specified.

"(6) Company agrees that the estimate and shipping specifications of the dealer will receive company's careful attention, but company does not agree absolutely to fill them, but expressly reserves the right to refuse them from time to

time, or such parts of them as company deems necessary or proper, and all such estimates are subject to delays occurring from any cause whatsoever in the manufacture and delivery of its product—no legal liability to fill such estimates being incurred under any circumstances. And the dealer may cancel, upon one month's written notice to company, any unfilled part of said estimates.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"(8) Company will sell its Ford automobiles, trucks, chassis, Fordson tractors, Lincoln automobiles and chassis to dealer as hereinafter provided at discounts from its established list prices, f. o. b. Detroit, Michigan, as follows:

\*　　\*　　\*　.　\*　　\*　　\*　　\*

"(17) This agreement shall continue in force and govern all transactions between the parties hereto until canceled or terminated by either party, but it is agreed that either party shall have the privilege, with or without cause, to cancel and annul this agreement at any time upon written notice by registered mail, or personal delivery of notice to the other party, and such cancellation shall also operate as a cancellation of all unfilled retail and other orders and requisitions for all products of company which may have been received by the company from the dealer prior to the date when such cancellation is served."

That contract was dated March 14, 1923, and was signed in triplicate by Maddox for the Maddox Motor Company. One copy he retained, and the other two were returned to the Dallas office. After some negotiations, Maddox purchased a lot 100 feet square, on which he intended to, and did thereafter, erect a suitable building, one which he intended should be satisfactory to the representatives of the Ford Motor Company. There was some delay, however, in clearing the title and in securing possession of the lot. The erection of the building did not begin till in December, 1923. In the meantime, Maddox Motor Company, as the agency was styled, occupied a leased building, and was receiving and selling cars and other products of the Ford Motor Company. On January 2, 1924, Maddox received another written contract from the Ford Motor Company, with notification that it was intended to supersede the former contract. It was, in all respects material to the issues here in controversy, a copy of the previous written agreement which had been executed by the parties. The substitution of that for the former contract was made necessary in order to include other products of the Ford factory not mentioned in the first contract, and to provide for the commissions to be paid the dealer. On account of delay in perfecting title to the lot and the weather conditions, the work on the building progressed slowly, or at least not to the satisfaction of the representatives of the Dallas Ford Agency. As a result of that delay, the shipment of cars to the Maddox Motor Company was either suspended or so diminished as to create dissatisfaction on the part of Maddox.

In March, 1924, he went to Dallas for another conference with the representatives of the Ford Motor Company. The following is his version of the conversation which took place between him and Proctor, the assistant branch manager, and Brown, the chief roadman:

"The first thing I asked Mr. Brown was why it was they wasn't shipping me any cars; they were withholding my cars just at that time, and had been for several days, and he said, 'You want to find out about cars; you will have to talk to Mr. Proctor.' I then walked into Mr. Proctor's office and saw Mr. Proctor. I asked him why I wasn't getting any cars, and he said, 'I don't know whether we have any cars available'; and I said, 'Mr. Proctor, you are shipping them all the time'; and he said, 'You may not need any cars; we may be forced to cancel you'; and I said, 'On what grounds do you seek to cancel me, Mr. Proctor?' and said, 'My God, man, don't you know?' and I said, 'No, I don't.' And he said, 'Why, you haven't even got a Ford accounting system in your place of business.' \* \* \* And I said, 'Mr. Proctor, there is nothing in my written or oral contract that I had with Mr. Brown that states anything in either of them that I am compelled to put in a Ford accounting system or any other system.' And he seemed to get a little bit peeved, and he picked up a file and said, 'If you want to talk about contracts you go back and talk to Brown,' and he commenced to read letters, and I left his office, and went on in and talked to Mr. Brown. \* \* \* I said, 'Mr. Brown, it is very encouraging to have a demand left that I must begin building operations in thirty days, and you refuse and fail to ship me any cars to sell.' I said, 'I haven't got much encouragement to go ahead and try to perfect my contract I have on my lot I wish to build on.' 'Well,' he said, 'Maddox, Pittsburg always has been a curbstone proposition; it has been a hard place to get an adequate Ford dealer, get a dealer that would furnish us with adequate quarters. Now,' he said, 'listen, if you will go back home and do your best—' I said, 'Mr. Brown, it's encouraging to me to have gone this far with a contract on a lot that I am going to be forced to comply with and pay for at a price of $4,500, and you people refuse to ship me cars, and I have denied all cars now for several weeks, and can't get your products to sell, and you are demanding that I begin building operations within 30 days'; and he said, 'Maddox, are you ever going to get that lot title cleared up?' and I said, 'Yes, I will be forced to clear it up, and I will be forced to take it when the title is clear. It just takes a matter of time to get the title cleared up and possession'; and he said, 'If you will go back and do your best and secure this lot and build on it at the quickest possible moment, we will give you more cars, and we will let you have this contract for the period of six years, which I agreed to let you have.' So I left the office and went back, and they began to ship me cars, and I went ahead with my business."

The building above referred to was being erected by day labor, and under the personal supervision of Maddox. At the time that conversation occurred very little seems to have been done in the erection of the struc-

ture. Upon his return home, Maddox received more cars, and resumed the conduct of his business in the usual way. Some time later the Ford Motor Company shipped to the Maddox Motor Company a carload of tractors, which the latter refused to accept. A difference then arose between Maddox and the representatives of the Ford Motor Company at Dallas, which resulted in the cancellation of the contract by the Ford Motor Company. Another party was subsequently given the agency at Pittsburg, to whom Maddox sold the Ford stock he then had on hand. At that time the building was nearly completed, and a portion of the stock of the Maddox Motor Company had been moved into it. An offer was made by the successor to the Ford agency to rent the building, but the parties failed to agree on the price, and no rental contract was made. The testimony shows that Maddox was using the building at the time of the trial in selling other automobiles.

In this suit the appellees rely on the written contract executed on January 2, 1924, as modified by a parol agreement made with Brown at Dallas on or about March 10 following. It is conceded that, under the express stipulations contained in paragraph 17 of the written contract, the appellant had the option to discontinue selling its cars and products to the appellees at any time, and that appellees had the same right to discontinue buying appellant's cars and products. The cause of action is based upon what appellees claim is a valid and binding parol agreement made with K. W. Brown, appellant's agent, which modified the above-mentioned contract and obligated appellant to sell and ship its cars and products to the appellees at Pittsburg for a term of six years from the completion of the building which appellees had agreed to erect. There is some uncertainty in the pleadings as to when that six-year term was to begin and end; but, since it is conceded that the appellant canceled the contract within less than six years from the time the original contract was entered into, that uncertainty becomes unimportant. As evidence of the binding parol modification of the written contract, appellees rely on what was said in the conversations with K. W. Brown. Their version of those conversations has been quoted, and need not be here repeated.

In the trial below and in this appeal that parol agreement is assailed upon two grounds: First, that by its terms it creates an obligation which was not to be performed within one year, and is in violation of the statute of frauds; second, that Brown had no authority to make such an agreement.

[1-4] Since the written contract is one determinable at the option of either party, it was not required to be in writing, and for that reason it may be modified or amended by a subsequent parol agreement. The modification pleaded expressly stipulates that it shall continue for a term of six years. Whether or not such an agreement must, in order to be valid, be in writing, depends on the nature of the obligations which it imposes. A contract which expressly provides for obligations to be performed during a period of more than a year but which may upon the happening of some contingency be fully performed within less than a year is not obnoxious to the statute of frauds. It has been held that, if the contract evidences a personal undertaking which ends with the death of one or more of the parties, it comes within that class of contracts which may be performed within less than one year, regardless of the contractural period named. Weatherford, etc., Ry. Co. v. Wood, 88 Tex. 191, 30 S. W. 859, 28 L. R. A. 526; Warner v. T. & P. R. Co., 164 U. S. 418, 17 S. Ct. 147, 41 L. Ed. 495. The contract here under consideration is, we think, a personal one. If Maddox and Mitchell, who composed the partnership, Maddox Motor Company, had died, the contract would have ended. The evidence makes it clear that in making contracts of this character the appellant was much interested in selecting dealers because of their personal fitness to conduct a satisfactory and successful sales agency. It was expressly provided in the written contract that it should not be assigned without the consent of the Ford Motor Company. Those facts bring this contract within the rule announced in the cases above referred to.

[5] The next question is, Was Brown authorized to bind the appellant by the oral agreement relied on in this case? If the appellees must depend upon actual authority in Brown, they have failed to discharge the burden imposed by law of proving that authority. All the relevant testimony shows that Brown was a subordinate agent—what they call the chief roadman in Texas—and, had no power to make or modify the written contracts sent out from the home office of the appellant. That power was lodged in the higher officials of the company. As evidence of Brown's authority, appellees refer to what Proctor, the assistant manager at Dallas, said to Maddox when the latter stated to Proctor that there was nothing in his oral or written contract requiring him to keep any system of bookkeeping. It is true Proctor then referred Maddox to Brown, but evidently that was done only to settle a dispute about a detail which was not incorporated in the written contract. There is no evidence that Proctor knew anything about what had occurred between Maddox and Brown previous to that time. Certainly there was nothing in what Proctor said to justify Maddox in assuming that Brown was thereby empowered to make a radical change in the written contract under which the business was then being conducted.

It is claimed, however, that, if Brown had no actual authority to make the parol modification of the written contract, he had the

apparent authority to do so. What constitutes the apparent authority of an agent is thus stated in page 495, 1 Clark & Skyles on Agency:

"The apparent scope of an agent's authority is that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have. The question is not what was the authority actually given, but what was the third party, dealing with the agent, and induced by the principal's acts, justified in believing the authority to be. The authority of an agent must be determined by the nature of his business and the apparent scope of his employment therein. It cannot be narrowed by private and undisclosed instructions, unless there is something in the nature of the business or the circumstances of the case to indicate that the agent is acting under special instructions or limited powers."

[6, 7] It is elementary that one who deals with an agent of a corporation must exercise proper diligence to ascertain the agent's authority to bind his principal. Whether or not the agent is acting within the apparent scope of his authority must be determined by what the principal has done, not by the unratified acts and declarations of the agent. Morgan v. Harper (Tex. Com. App.) 236 S. W. 71; 1 Clark & Skyles on Agency, p. 509.

[8] After a careful examination of the evidence, we have reached the conclusion that it does not support a finding that in making the parol agreement relied on as the basis of this suit Brown was acting within the apparent scope of his authority. In reaching that conclusion, we have taken into consideration only the apparently conceded facts and that portion of the testimony which came from appellees' own witnesses. Maddox, it seems, conducted all the negotiations with the appellant's agents. He was a man of business experience, and of at least average intelligence. He was to some extent familiar with the methods adopted by the appellant in contracting and dealing with its sales agents, or "dealers," as they are called, before he applied for the first contract. He knew why the contract with Nichols had been canceled. He also knew that appellant was interested in securing capable and enterprising dealers who would occupy suitable buildings favorably located for the sale of its cars and automobile accessories. He testified that in his first interview with Brown he agreed to secure a well-located lot, and build on it a house that would be acceptable to the Ford Motor Company. His partner, Mitchell, who was present, concurred in that promise, and personally guaranteed that this would be done. It was upon the faith of that promise that appellant's first written contract was made. It is true that Maddox also testified

that in that conversation Brown told him that the written contract which was to follow would not embrace that six-year provision, and that the writing to that extent might be disregarded.

However improbable it might be that such directions were relied on, it is an admitted fact that the written contract was sent and signed within a few days after that interview, and was evidently recognized as binding in all of its terms. That contract contained paragraph 17, which made the entire agreement revocable at the will of either party. Maddox admitted that he was familiar with that provision of the contract. Presumably he read the instrument before he signed it. As a business man of ordinary intelligence, he must have known that this written contract, which Brown told him would come from the home office, would be superior to any verbal agreement previously made with Brown. With full notice thus given that Brown's assumption of authority to make an important contractual stipulation was either unknown to his principal, or, if known, had been repudiated, Maddox accepted the written contract as the one under which he and his associate were willing to conduct their business and to purchase a lot and erect a building thereon that would be acceptable to the appellant. It was under that first written contract that he purchased and sold Ford cars and accessories until January 2 the following year, 1924. On the date last mentioned he signed another written contract, which contained the same paragraph 17 expressed in the exact language used in the first contract. He unconditionally accepted both of those contracts, and continued his business dealings with the appellant without making any objections to the terms of the writings, or asking for any modification. In his testimony in the trial below he makes it clear that he did not go to Dallas in March, 1924, the date he says the second parol agreement was made with Brown, for the purpose of securing a modification of paragraph 17, or of any other provision of the written contract last signed, but to ascertain why he was not receiving more cars. According to his own statements, up to that date Maddox had done all that he could to secure the lot and erect the building demanded by appellant's agents. In fact, the lot had been contracted for, and the delay complained of was due to some formalities necessary to clear the title. In addition to signing the second written contract on January 2, 1924, Maddox executed the following written instrument:

"Estimate and Shipping Specifications for the Year Ending December 31, 1924.

"Ford Motor Company, Highland Park, Michigan, Dallas Branch.

"In accordance with the provisions of sales agreement executed with your company, for the

sale of its products, I estimate I shall sell at retail the following cars, trucks, chassis, and tractors for the year ending December 31, 1924, specifying the months in which shipments are to be made without any further or confirming orders, permitting you, however, to change the model specifications or shipping dates to conform to your productions as manufactured.

"I agree to receive, accept and pay for such products in accordance with the terms of sales agreement."

Then follows a list of cars, trucks, and tractors. The execution of that instrument indicates that Maddox expected to continue his business relations with the appellant under the terms of the unmodified written contract.

With full notice that the written contracts were sent out from the home office, he must have known that those in chare of the home office dictated the terms. When he found that those terms were in direct conflict with what Brown had agreed to do, he must have known that Brown's assumption of authority was repudiated. There is no evidence that any of the contracts were signed by Brown.

[9] Liability for the unauthorized acts of an agent done within the apparent scope of his authority rests upon the principle of estoppel. Unless the party dealing with such agent has been misled by the conduct of the agent to alter his position or to make or perform some agreement which would result in an injustice to such third party, if the principal were permitted to deny the authority of the agent, the doctrine of apparent authority has no application. Hobby v. King Trailer Co. (Tex. Civ. App.) 273 S. W. 650; 2 Corp. Juris, p. 461; 21 Corp. Juris, pp. 1172, 1173. The purchase of the lot and the erection of a building acceptable to the appellant is all appellees rely on which might, under any circumstances, constitute an estoppel against the appellant to deny Brown's apparent authority in this case. When the testimony of Maddox is considered in its entirety, he makes it plain that appellees were not induced by the parol agreements with Brown to purchase that lot and erect that building. It is true Maddox stated that, before any writing was signed, Brown agreed that appellees might have the agency for six years. But, before they did anything toward purchasing the lot, or erecting a building, the written contract which in effect superseded the parol agreement was presented to them and signed without objection. That contract contained the following provision:

"Dealer agrees to maintain a place of business and properly equipped salesroom and service station, prominently located and acceptable to the company, and shall employ competent salesmen and efficient workmen and company shall not in anywise be responsible for any charges connected with such place of business."

That provision was repeated in the second written contract. It was while doing business under those written contracts alone that the lot was purchased and preparations were made to erect the building acceptable to the Ford Motor Company.

The remaining assignments of error need not be considered further than to say they are overruled.

For the reasons stated, the judgment will be reversed, and the cause remanded for a new trial.

### On Motion for Rehearing.

Before considering the more important question presented in this motion for rehearing, we wish to correct an error appearing in the previous statement of the evidence. The original opinion contains the following: "The erection of the building did not begin till in December, 1923." Instead of "1923" it should have stated "1924." The evidence shows that the appellee did not get possession of the lot until about that time.

This suit, as stated in the plaintiffs' amended original petition, is based upon the authority of an agent, K. W. Brown, appellant's chief roadman, to modify and annul a material provision of a written sales agreement which had been sent out from appellant's home office, and which had been accepted and signed by the appellees as the basis of their dealings with the appellant. In a supplemental petition filed in reply to appellant's denial of Brown's authority, the plaintiffs pleaded that, if Brown did not have actual authority to make such modification, he had been clothed with apparent authority to do so, and that the appellant was estopped to repudiate Brown's acts. The grounds of estoppel alleged will be referred to later. The jury found that Brown did have actual authority to modify the original contract; but, as previously stated, we have concluded that the evidence did not warrant that finding, and the court should have sustained the appellant's objection to the submission of that issue.

[10] Over the objection of the appellant, the appellees were permitted to prove by both Maddox and Mitchell a parol agreement made with Brown in March, 1923, whereby the Maddox Motor Company was given the right to sell Ford cars and Ford products for a term of six years. That testimony is quoted in full in the original opinion, and need not be here repeated. There were several objections made to the admission of that testimony, but we shall discuss only one of them. The proof shows that this conversation occurred about the 10th of March, 1923, at the time Maddox and Mitchell applied for the Ford sales agency at Pittsburg. It further appears that a few days thereafter a lengthy written sales agreement was sent from the home office of the appellant bearing the signature of the Ford Motor Company, by F. A. Atcheson, Branch Manager. That writing

was signed in triplicate for the Maddox Motor Company by F. W. Maddox. It was dated March 14, 1923, and contained stipulations directly in conflict with the previous parol agreement which it is alleged was made with Brown. Whether the appellees intended to accept that written contract as superseding all previous parol stipulations as to the duration of the contract relations between the parties is of no importance. That result was the legal effect of what was done, whether so intended or not. There is no claim of fraud, accident, or mistake in the execution of the written contract, and, under the well-established rules of law, its terms thereafter controlled the rights of the parties. It is to be inferred from the record that the testimony objected to was offered for the purpose of informing the jury that such a parol agreement had been made, and evidently that fact did influence the jury in its findings. The testimony was clearly inadmissible, and should have been excluded.

[11] If that parol agreement be excluded, then the appellees must rely for a contract giving them the right to sell Ford cars and Ford products for a term of six years upon a second parol agreement which they claim was made with Brown in March, 1924. The testimony of Maddox regarding that agreement has been quoted at length in the original opinion. The admission of that testimony was objected to upon the ground that there was no evidence of the authority of Brown to enter into such contract and thus bind the defendant. If there was no evidence of any authority in Brown to so bind the defendant in making such parol agreement, then there must have been an absence of any evidence showing powers conferred upon Brown having the appearance of such authority. Apparent authority is based upon evidence which tends to show the existence of actual authority. Hence, under the objection made, if there was not sufficient evidence to show real or apparent authority in Brown to bind his principal in such a transaction, the court should have sustained the objection to the testimony of Maddox as to the making of the second parol agreement.

We come then to consider the question, Does the record show that Brown had been clothed by his principal with powers which bore the appearance of authority to make such a parol modification of the written sales agreement? If that question should be answered in the negative, then there was no basis for the judgment rendered against the appellant in this suit. The evidence shows that Brown was known as the "chief roadman" of the appellant's Dallas branch office. He thus testified as to what his duties were:

"I said that my duties as chief roadmen were the supervising of the work of the roadmen in the territory in their working with the dealers with an idea of assisting them in carrying on their business. As to whether or not that was the only power I had, I had numerous other detail duties around the branch, such as correspondence and various things. I had only the authority given me by the management, of that small department that I had, the roadmen, about twelve or fifteen men, working along the lines I have just outlined to you. That is all the power I had, was as to having charge of the roadmen and their co-operation with the dealers, their working with the dealers."

Both Brown and Proctor, appellant's branch manager at Dallas, testified that Brown had no authority to make or modify the general written sales agreement with dealers that was sent out from the home office of the appellant. We have failed to find in the record any evidence to the contrary of what these two witnesses stated. We do not understand that it is now contended that Brown did have the actual authority to make such a modification of the written contract, but appellees insist that he had been clothed with apparent authority to do so. In response to an elaborate argument in the motion for a rehearing, we have again carefully examined the voluminous record of the evidence with a view of ascertaining if there are any facts which warrant that conclusion. The evidence relied on to show the appearance of authority consists mainly of letters written by Brown to the Maddox Motor Company and a few written to the Nichols Motor Company prior to the time Maddox and Mitchell applied for the Ford contract. The proof shows that the appellant was a large corporation, with its place of business at Detroit, Mich. Maddox testified as follows:

"I knew that an authorized Ford dealer when he goes into that business he is in a business of handling Ford products and carrying on the business under the policy of the Ford organization, and I also knew enough about the Ford business and the handling of Ford cars to know that it was an organization that sold the entire world."

Maddox had occasion to become familiar with three of appellant's written sales agreements which had been made with its dealers. One of these was made with the Nichols Motor Company in 1922, and the other two with the Maddox Motor Company through Maddox himself. None of those contracts was signed by Brown. The first was signed by A. J. Langford, the second by F. A. Atcheson, and the third by W. C. Proctor. All of those men were designated as "branch managers." Each one of the contracts contained the provisions of paragraph 17, which expressly stipulated that the contract was determinable at the option of either party. The inclusion of such a provision in all the written contracts was, we think, sufficient to put Maddox on notice that the retention of the right of revocation at will was a part of the policy of the Ford corporation in the conduct of its extensive business. On January 2,

1924, a little more than two months before the second parol contract with Brown was made, Maddox received the following letter from Langford, appellant's manager at Dallas:

"To All Dealers:

"All statements or agreements contained in this letter are contingent on strikes, accidents, fires or any other causes beyond our control, and all contracts are subject to approval by the signature of a duly authorized executive officer of this company. Clerical errors subject to correction.

"We have revised our Ford sales agreement to include the Lincoln and to provide for the present scale of Ford car, truck, tractor and parts discounts, also several minor changes, and the new agreement signed by us is submitted herewith in triplicate for your signature. Please sign all three copies, retaining one copy for your records and returning the other two copies to us.

"The new sales agreement supersedes your present Ford sales agreement which is hereby canceled as of this date.

"This letter is forwarded in duplicate so that you may indicate your understanding and acceptance of the new arrangement and the cancellation of the old agreement by affixing your signature to one copy in the space provided and returning to us for our records. Please do so at once."

Below the signature of Langford appears that of Maddox Motor Company, by F. W. Maddox, showing that he received the letter and acquiesced in its requirements. It will be noticed that this letter contained a preamble in which it is stated that "all contracts are subject to approval by the signature of a duly authorized executive officer of this company." That same language is found on other letters received by Maddox from appellant's Dallas office prior to the time he claims to have made the parol agreement with Brown. In view of the contention that Brown assumed the authority to cancel contracts, attention is called to the following letter written by him to the Nichols Motor Company at about the time when Maddox was interested with Nichols as a Ford dealer.

"Dallas, Tex. Feb. 23, 1923.

"Nichols Motor Company, Pittsburg, Tex.— Gentlemen:

"(All statements or agreements contained in this letter are contingent on strikes, accidents, fires or any other causes beyond our control, and all contracts are subject to approval by the signature of a duly authorized executive officer of this company. Clerical errors subject to correction.)

"After reviewing very carefully all reports from roadmen, together with other correspondence on that point, we have decided that for the best interest of the company it will be necessary for us to cancel sales agreement with you, and we are therefore requesting this from the home office to-day.

"You must admit yourself that we have been very lenient with you over quite a lengthly period, giving you every possible opportunity to get lined up, so you have no one now to blame but yourself.

"Ford Motor Company,
          "K. W. Brown, Chief Roadman."

That letter clearly indicated that the power of canceling contracts was lodged in the "home office." The record does not contain any evidence that the authority to cancel a Ford sales contract had ever been exercised by Brown or by any man connected with the Dallas branch office.

Maddox admitted that he was familiar with paragraph 17 which appeared in all the written contracts. If that be true, he must have known that any assumption of authority by Brown to make a contract fixing a definite term of years during which the sales agreement should run was either unknown to the appellant or had been repudiated by it. After the first alleged parol agreement with Brown, two written contracts were presented to, and signed by, Maddox, both of which were accepted without objection. While it is not made clear who constituted the executive officers of the Ford corporation, the signatures to the three written contracts which came under the immediate observation of Maddox plainly indicated that Brown was not one of those executive officers who had been clothed with authority to make such contracts. If Brown had no power to make such a contract, clearly he had none to materially change it.

Complaint is made that the Ford contract is lengthy and exacting in its terms. When we consider the extensive business of a large dealer in automobiles, and the numerous agents through which its business must necessarily be conducted, it is at once apparent why so many details should be committed to writing, and why appropriate limitations should be placed upon the powers of local representatives of the company. It appears from the evidence that the sales agreements made with dealers were on printed forms sent out from the home office of the appellant, and were designed to be used in many different states and countries. That fact is indicated by the following concluding paragraph of the agreements:

"It is mutually understood this is a Michigan agreement and shall be construed as such. It is further understood by the parties hereto that this is a general selling agreement intended for use by manufacturer wherever its products may be sold, and therefore if any of its provisions shall contravene, or be invalid, under the laws of the particular state, country or jurisdiction where used, then it is agreed that such contravention or invalidity shall not invalidate the whole agreement but it shall be construed as if not containing the particular provision or provisions held to be invalid in the state, country or jurisdiction, and the rights and obligations of the parties shall be construed and enforced accordingly."

Across the head of each contract are these words, in large type: "Ford Sales Agreement." With all those facts brought to the attention of Maddox, there appears to be no substantial basis for his belief that a chief roadman like Brown had authority to annul an important provision which appeared in every printed form sent out from the appellant's main office.

[12, 13] The general rule is that the principal has the right to repudiate the unauthorized contract of his agent, except when the contract has subsequently been expressly or impliedly ratified, or when an innocent third party, who has exercised proper diligence to ascertain the authority of the agent, would be injured by permitting the principal to repudiate the acts of the agent. The reason for the rule is thus stated in 2 C. J. p. 573.

"For the acts of his agent within his express authority the principal is liable, because the act of the agent is the act of the principal. For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons."

The appellees pleaded two distinct agreements with Brown, the agent. One was made in March, 1923, and the other in March, 1924. As has been previously stated, the agreement of 1923 was superseded by the written contract executed a few days later, and for that reason that parol agreement cannot be considered as the basis for the estoppel pleaded. The question then is, Were the appellees induced by the second parol agreement to change their contractual position from what it was prior to that time, or to do anything which they had not previously bound themselves to do? While Brown denies making either of the parol agreements, we shall assume that he did make them. One who pleads an estoppel has the burden of proving the facts which constitute the estoppel. The appellees present only two things as having been induced by the second parol agreement. One is the purchase of the lot, and the other is the erection of the building thereon. We have again examined the evidence, and find no reason for changing our original conclusion—that the lot was purchased and the building was erected in pursuance of the contract of 1923. That fact is made plain by the testimony of Maddox and the letters written by him to the appellant's agents at Dallas.

Moreover, there is in the record no evidence that the lot and the building were not worth what they cost, or that they did not prove a profitable investment. Nor is there any evidence that the building was not useful for purposes other than those for which it was originally designed. The only damages claimed in this suit is the loss of the profits which the appellees expected to make by a continuation of the Ford sales agency.

The motion is overruled.